Filed 6/30/22  In re Lilianna G. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re Lilianna G., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E078458 |
| Plaintiff and Respondent, | (Super.Ct.No. J284948) |
| v. | OPINION |
| J.J. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant G.G.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant J.J.

1

Tom Bunton, County Counsel, and Svetlana Kauper, Deputy County Counsel, for Plaintiff and Respondent.

In this dependency proceeding, J.J. (mother) and G.G. (father) (collectively, parents) appeal from the termination of their parental rights to their minor daughter, Lilianna G. Parents contend that the juvenile court erred by failing to apply the beneficial parental relationship exception under Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i) (unlabeled statutory references are to this code). We affirm.

## BACKGROUND

The family came to the attention of San Bernardino County Children and Family Services (CFS) in April 2020, when Lilianna was four months old and her half-sister A.G. was seven years old. (A.G. is not a subject of this appeal.) Mother and both children lived with mother's parents. Lilianna had lived with her maternal grandparents since birth.

CFS received a referral based on an incident of domestic violence between father and mother. Mother and both children were visiting father at a motel when parents got into some sort of quarrel and altercation. Mother called 911. Father, whose breath smelled of alcohol, told a law enforcement officer that mother threw a can of powdered baby formula at him, hitting him in the face. Father had no visible injuries. Mother was arrested for spousal battery.

Later that day, father spoke with a social worker and recanted. He said that he had falsely reported what happened and that he and mother did not have an argument. He

2

called law enforcement because he believed mother was going to take Lilianna away. Father denied that he and mother were in a domestic violence relationship.

CFS temporarily detained Lilianna and A.G. and placed them with a maternal great aunt. CFS filed a dependency petition alleging that Lilianna was at substantial risk of serious harm because of domestic violence between mother and father, father's substance abuse problem that mother should have known about, father's inability to provide a stable home for Lilianna because he was homeless, and parents' mental health issues. (§ 300, subd. (b)(1).) The juvenile court detained Lilianna and ordered once weekly two-hour supervised visits for mother and father and gave CFS discretion to liberalize as to the frequency and the duration of the visits. The court ordered parents to visit Lilianna separately because of the domestic violence allegations.

In late May 2020, Lilianna was placed in maternal grandparents' home. In the jurisdiction and disposition report filed around the same time, the social worker reported that it was "clear" that mother and father loved Lilianna. The social worker reported that mother had attended all of her visits with Lilianna and that the initial visit the social worker observed went well. Mother acted affectionately toward Lilianna and fed her a bottle. In order to maintain Lilianna's bond and attachment to mother, CFS increased mother's supervised visits to three times per week for two hours each visit.

Father visited with Lilianna via video. The social worker reported that Father acted affectionately toward Lilianna, praised her, communicated with her, and soothed her when she began to get fussy. Lilianna appeared engaged with father for about 30

3

minutes.  Father and the caregiver agreed to supervised video visits three times per week until an appropriate location for in-person visits was found.

In late June 2020, maternal grandmother and father reported that some of father's video visits were cut short because maternal grandmother's phone battery died.  Maternal grandmother reported to CFS that she was no longer willing to supervise father's visits because he called and texted her "'nonstop'" about visiting Lilianna and threatened to take the children away from her.  CFS determined that video visitation was no longer appropriate and scheduled the first in-person visit between father and Lilianna to occur at CFS's office with another relative supervising.

Approximately two weeks later, CFS filed an amended petition adding an allegation that Lilianna was at substantial risk of physical harm or neglect as a result of mother's substance abuse.  (§ 300, subd. (b)(1).)  An unidentified collateral source had reported to the social worker that mother had a history of using methamphetamine, which A.G.'s father confirmed.  Father initially denied and then confirmed that mother was currently using methamphetamine, which mother denied.

In mid-August 2020, father sustained serious bodily injuries as a result of a single-vehicle collision in which he was the driver.  He was arrested on suspicion of driving under the influence.  One month after the collision, CFS reported that father remained hospitalized because of the injuries he sustained.  Father consequently resumed visiting Lilianna by video.  The supervised visits were arranged for three times per week for 45 minutes per visit.

4

The court held a contested jurisdiction and disposition hearing in October 2020. Mother testified. She said that Lilianna had never been in father's care. For the first four months of Lilianna's life (before she was detained), Lilianna was in mother's exclusive care.

The juvenile court dismissed some of the allegations in the amended petition and sustained others, including that both parents placed Lilianna at substantial risk of harm by exposing her to domestic violence, by engaging in physical violence in Lilianna's presence, and as a result of both parents' substance abuse. The court found father to be Lilianna's presumed parent. The court removed Lilianna from parents' custody and ordered reunification services for both parents. The court ordered twice weekly, two-hour supervised visits for mother and once weekly, two-hour supervised visits for father. Parents were ordered to visit Lilianna separately. CFS had authority to increase the frequency and duration of the supervised visits.

In the six-month status review report filed in April 2021, CFS recommended terminating parents' reunification services and setting a permanency planning hearing under section 366.26. The social worker reported that Lilianna, who was 16 months old, was doing well and happy in her maternal grandparents' home. Lilianna appeared to be reaching all of her developmental milestones—she was "walking all over, climbing, and babbling." Maternal grandparents were willing to adopt.

Mother had maintained regular visitation with Lilianna. Maternal grandmother reported that Lilianna always appeared happy to see mother and that the visits were

5

positive. Mother sometimes cancelled and rescheduled visits, so maternal grandmother stopped telling Lilianna and A.G. when mother's visits were scheduled, in order to avoid disappointing them.

Father continued to visit Lilianna via video. The visits appeared to go well. The social worker reported that Lilianna appeared "as attentive as she can be for a one year old via video." Several months after the collision, the social worker set up in-person visits, but father asked for visitation to remain virtual.

The six-month review hearing was originally calendared for April 30, 2021, but was continued to June 24, 2021, and converted into a contested 12-month status review hearing. The juvenile court adopted CFS's proposed findings and orders from the April 2021 report and found that return of Lilianna to parents' custody would be detrimental to Lilianna. The court terminated parents' reunification services and set a permanency planning hearing under section 366.26. The court ordered once weekly, two-hour supervised visits for mother and once weekly, two-hour supervised visits for father. CFS had authority to increase the frequency and duration of the supervised visits.

In preparation for the section 366.26 hearing, the social worker reported that Lilianna's relationship with maternal grandparents was "quite close" and very loving and caring. Lilianna had lived with them for most of her life, nearly two years. Lilianna was "well bonded" with maternal grandparents and sought nurturing and guidance from them. Lilianna was reported to be in good health and meeting all of her developmental milestones. Maternal grandparents wanted to adopt Lilianna.

6

Mother continued to visit regularly with Lilianna, and her visits were liberalized to be longer than two hours. Father continued to visit with Lilianna by video along with paternal grandmother. Father asked CFS to liberalize his visits, but CFS declined.

CFS recommended terminating parents' parental rights to Lilianna and freeing her for adoption. The contested section 366.26 hearing was held on February 1, 2022. Without objection, CFS introduced into evidence the section 366.26 report and an additional information report filed before the hearing. Parents and a social worker testified.

Father stated that he loves Lilianna and wants to maintain a relationship with her. He testified that over the past year he attended all possible visits with her. Before father was injured in the car accident, he visited Lilianna in-person. He could visit her only by video after the collision because of a "leg condition." During visits, father and Lilianna would eat lunch. She called him "Daddy." He believed their relationships grew stronger with each visit. Upon first seeing him, Lilianna appeared happy and would throw up her arms. Father and Lilianna would sing and dance. During their visits, father would teach Lilianna how to count to five and identify colors in both English and Spanish.

Father testified that terminating his parental rights would be detrimental to Lilianna because of the way she reacted when the internet connection would become "clippy" during visits. He said that Lilianna would cry and say that she wanted to see "Daddy" and paternal grandmother.

Mother testified that she was Lilianna's primary caregiver for the first four months of Lilianna's life while they were living with maternal grandmother. Lilianna calls her "Mommy" or "Mama." Mother visited Lilianna throughout the case. Mother's visits were in-person and initially were limited to one hour but progressed to being all day. Mother would play with Lilianna, read to her, and sing with her. Mother also would bathe Lilianna and put her to bed. Mother did not want her parental rights to Lilianna terminated and believed that a legal guardianship would be in Lilianna's best interest.

The adoption social worker who authored the adoption assessment and the visitation portions of the section 366.26 report testified. He was assigned to the case starting in June or July 2021. He assessed the children to determine whether it would be detrimental for them to be adopted. In performing that assessment, he spoke with the caregivers and Lilianna. Given Lilianna's young age, his conversation with her was "pretty much minimal." He observed Lilianna with maternal grandparents and described her as being "very attached" to them. The social worker did not believe that it would be detrimental to Lilianna to terminate parental rights. The social worker acknowledged that it was difficult to assess the detriment Lilianna might suffer because she could not express her opinion.

The social worker never supervised visits between Lilianna and father and had no personal knowledge of those visits. Father's counsel did not ask the social worker any questions about any information contained in the section 366.26 report.

8

Mother's and father's counsel argued that termination of parental rights would be detrimental to Lilianna. Counsel urged the court to order a less restrictive permanent plan, such as legal guardianship.

The juvenile court found Lilianna likely to be adopted, and the court terminated mother's and father's parental rights. The court described the elements of the parental bond exception and specifically referred to *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) and *In re Autumn H.* (1994) 27 Cal.App.4th 567 (*Autumn H.*) The court found that both parents satisfied the first two requirements of demonstrating that they had visited regularly and that continuing their relationship with Lilianna would benefit her. However, the court found that neither parent satisfied the third requirement of demonstrating that terminating their parental rights would be detrimental to Lilianna. For the third requirement, the court explained: "In making this detriment determination, the juvenile court does not look to whether the parent can provide a home for the child and is not comparing the parents' attributes as custodial caregiver relative to those of any potential adoptive parents. Also, in the case of *In Re Caden C*, they, too, stated at a Section .26 hearing, the question before the Court is decidedly not whether the parent may resume custody of the child."

Applying those principles, the court indicated that it had considered father's testimony about his "strong connection to" Lilianna, the quality of his video visits with her, and "her reactions to when he is there on video." With respect to mother, the court noted that Lilianna had spent only four months in mother's custody and had otherwise

9

spent the majority of her life living with her maternal grandparents. The court also noted that Lilianna's needs were being met by maternal grandparents. As to both parents, the court found that "[t]here has been no evidence that it would be detrimental to [Lilianna] to terminate her parental rights."

DISCUSSION

A. *Legal Framework*

When the juvenile court finds that a dependent child is likely to be adopted, it must terminate parental rights and select adoption as the permanent plan unless it finds that adoption would be detrimental to the child under one of several exceptions. (§ 366.26, subd. (c)(1); *Caden C.*, *supra*, 11 Cal.5th at pp. 630-631.) "'[T]he statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'" (*Caden C.*, at p. 631, quoting *In re Celine R.* (2003) 31 Cal.4th 45, 53.)

Under the beneficial parental relationship exception, the parent bears the burden of proving three elements by a preponderance of the evidence: "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*Caden C.*, *supra*, 11 Cal.5th at pp. 631, 636, italics omitted; § 366.26, subd. (c)(1)(B)(i).)

We review for substantial evidence the juvenile court's findings on whether the parent has regularly visited and whether a beneficial parental relationship exists. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) Whether termination of parental rights would be detrimental to the child because of the beneficial parental relationship is reviewed for

10

abuse of discretion.  (*Id.* at p. 640.)  But we review any factual findings underlying that decision for substantial evidence.  (*Ibid.*)

In determining whether the exception applies, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."  (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; *Caden C.*, *supra*, 11 Cal.5th at p. 633.)

When "assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home."  (*Caden C.*, *supra*, 11 Cal.5th at p. 632, citing *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)  The parent must show that his or her relationship with the child "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."  (*Autumn H.*, at p. 575.)  "A showing the child derives some benefit from the relationship is not a sufficient ground to depart from the statutory preference for adoption."  (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646, disapproved on other grounds in *Caden C.*, at pp. 637, 638, fns. 6, 7.)  The court may consider issues ranging from "the specific features of the child's relationship with the parent and the harm that would come from losing those specific features to a higher-level conclusion of how harmful in total that loss would be."  (*Caden C.,* at p. 640.)  The court must also

11

assess "how a prospective adoptive placement may offset and even counterbalance those harms," and in that regard the court may consider "findings ranging from specific benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told." (*Ibid.*)

B. *Father*

Father argues that the juvenile court abused its discretion by concluding that terminating the parental relationship would not be detrimental to Lilianna. We are not persuaded. We agree with CFS that the juvenile court did not abuse its discretion by determining that any benefits Lilianna derived from her relationship with father did not "outweigh[] 'the security and the sense of belonging a new family would confer.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

Substantial evidence showed that during visits with Lilianna father shared an appropriate and loving relationship with her and that Lilianna was emotionally bonded with father to some degree. Lilianna was always happy to see father and sang and danced with him during their visits. But father "must show more than frequent and loving contact or pleasant visits." (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.) Father conflates the second and third elements of the parental bond exception and wrongly assumes that the evidence showing that he had a beneficial relationship with Lilianna necessarily also shows that terminating his parental rights would be detrimental to her. For the third element of the parental bond exception, the parent must demonstrate that the parental relationship constitutes such "'a substantial, positive emotional attachment'" that

12

severance would harm the child even when weighed against the benefits of a new adoptive home.  (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

Here, there was no evidence that the parental relationship was so significant as to outweigh the security and the stability of an adoptive home for Lilianna.  (*Caden C.*, *supra*, 11 Cal.5th at pp. 633-634.)  Lilianna was only four months old when she was detained, and father was not her primary caregiver during those first four months. Lilianna never lived with father.  Father also never had unsupervised visits with Lilianna. Although there was substantial evidence that Lilianna would benefit from continuing her relationship with father, there was no evidence that the relationship with father was "so important to [Lilianna] that the security and stability of a new home wouldn't outweigh its loss."  (*Id.* at p. 633.)

Moreover, the juvenile court did not abuse its discretion by concluding that father did not present any evidence that Lilianna would be greatly harmed by severance of the parental relationship.  The only evidence of possible detriment was father's testimony that when there were problems with the internet connection during video visits, Lilianna would cry and say that she wanted to see "'Daddy.'"  The juvenile court was free to disbelieve father's uncorroborated account of those events, particularly given father's history of dishonesty.  (*In re E.E.* (2020) 49 Cal.App.5th 195, 214.)  Father told the social worker that he had lied to law enforcement about mother's conduct on the night she was arrested for spousal battery; it follows that either he lied to law enforcement or he lied to the social worker.  Father argues that the absence of any evidence corroborating his testimony "is an example of the social worker omitting objective information about the

13

child's relationship with her father," but there is no evidence that the social worker knew of but failed to report Lilianna's alleged adverse reaction to connectivity problems during father's visits.

Even if the juvenile court believed father's account of Lilianna's reaction to those disruptions of his video visits, there was no evidence that Lilianna's reaction was anything more than momentary or had any adverse effect on her behavior or general emotional well-being after the visits ended. (See *Caden C.*, *supra*, 11 Cal.5th at p. 633 [losing the parental relationship might result in "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression"].) On the contrary, the record reveals that Lilianna was thriving in her placement with maternal grandparents. Lilianna was very attached to maternal grandparents, sought nurturing and guidance from them, and was meeting all of her developmental milestones while in their care. Moreover, there was affirmative evidence in the form of the social worker's testimony that termination of father's parental rights would not be detrimental to Lilianna.

In his reply brief, father argues that the juvenile court relied on factors that should not be considered under *Caden C.* The argument is forfeited because father does not provide any good cause for failing to make it in his opening brief. (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894, fn. 10.) In any event, there is no evidence that the juvenile court relied on any impermissible factors. Contrary to father's suggestion, the court did not impermissibly compare his attributes as a prospective custodial caregiver relative to those of maternal grandparents by discussing

14

how Lilianna was faring with them.  (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)  Instead, the court properly weighed whether the benefits Lilianna would receive through the security and stability of an adoptive home would, on balance, outweigh the harm of losing her relationship with father.  (*Ibid.*)

For these reasons, we conclude that the juvenile court reasonably concluded that Lilianna and father did not share such a substantial, positive attachment that Lilianna would be greatly harmed by severance of the relationship.

C.  *Mother*

Mother's sole argument is that the juvenile court abused its discretion by failing to conduct the analysis required by *Caden C.*, *supra*, 11 Cal.5th 614.  She contends that under *In re D.P.* (2022) 76 Cal.App.5th 153 (*D.P.*) we should remand for a new permanency planning hearing, because "there is some evidentiary support for each element of the beneficial parental relationship exception."  (Italics omitted.)  Father joins mother's argument.  The argument lacks merit.

In *D.P.*, the permanency planning hearing predated *Caden C.*  (*D.P.*, *supra*, 76 Cal.App.5th at p. 161.)  The juvenile court in that case consequently did not have the benefit of *Caden C.* and "performed no specific analysis on the beneficial parental relationship exception."  (*D.P.*, at p. 166.)  Because the record contained "some evidentiary support for each element" of the exception, the Court of Appeal reversed and remanded for the juvenile court consider the evidence under the applicable standard.  (*Id.* at p. 167.)

*D.P.* is inapposite for at least two reasons. First, Lilianna's permanency planning hearing was held in February 2022, almost one year after *Caden C.* was decided, so the juvenile court had the benefit of the Supreme Court's analysis. Second, in concluding that the parental bond exception did not apply, the juvenile court expressly and repeatedly cited *Caden C.* and explained why mother and father did not satisfy the criteria for the exception. The court found, correctly, that there was no evidence of detriment. For all of these reasons, mother's argument fails.

## DISPOSITION

The February 1, 2022, order terminating mother's and father's parental rights to Lilianna is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
                                                                    J.


We concur:

SLOUGH
            Acting P. J.
RAPHAEL
                    J.

16